IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | NO. 3:18-cr-00250 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| | ) | |
| DONNELL BOOKER | ) | |

## MEMORANDUM OPINION

Pending before the Court are four motions to suppress filed by Defendant (Doc. Nos. 115-118). The Government has filed a collective response in opposition to all four motions (Doc. No. 125), and Defendant filed a collective reply (Doc. No. 134). Also pending before the Court is Defendant's Motion for Disclosure of Confidential Informant (Doc. No. 114), to which the Government has responded (Doc. No. 124). The Court will address each of Defendant's motions below.

## I. Motion to Suppress Evidence Seized from the Search of 777 Banister Drive and 3453 Merganser Drive (Doc. No. 116).

Defendant seeks to suppress all evidence seized from 777 Banister Drive and 3453 Merganser Drive. Defendant argues that "the search warrants and affidavits were issued based upon material misrepresentations and omissions by the affiant, thereby resulting in an illegal entry and search of the residences." (Doc. No. 116 at 1).[1] Defendant requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

*Background*

On August 23, 2018, a General Sessions Court of Montgomery County Judge issued two

---

[1] In instances where the filer's pagination differs from the document-specific page number stamped by the Clerk's Office, the Court's reference will be to the latter rather than the former page number.

search warrants, one for 777 Banister Drive and one for 3453 Merganser Drive. (Doc. Nos. 116-1, 118-1). Agent Will Evans of the Clarksville Police Department submitted two nearly identical affidavits in support of the two search warrants. The Government aptly describes the allegations in the affidavit as follows:

> [The affidavits] included [] information from a confidential source ("CS") about the defendant's drug trafficking. [Doc. Nos. 116-1, 118-1]. On May 29, 2018, Agent Evans spoke with Lieutenant Rodney Anderson of the Jackson, Tennessee, Police Department. Lieutenant Anderson said that the CS—who worked with the Jackson Police Department for years on numerous investigations resulting in the controlled purchases of guns and drugs as well as the execution of search warrants—had information about the defendant. *Id*. at 2. Agent Evans then spoke with the CS, who identified the defendant as a high-ranking member of the Rolling 40 Crips gang who sold methamphetamine, marijuana, and heroin. *Id*. at 2-3. The CS recounted specific instances of the defendant's drug sales, some of which occurred at a nearby Wendy's, and described recently seeing $52,000 on the defendant's bed. *Id*. at 3. The CS also provided more innocent information about the defendant that was consistent with information already gathered from the defendant's Probation and Parole Officer ("P.O."), including the location of his residence and his phone number at the time. *Id*. at 2-3.
>
> In addition, the affidavits recounted statements Jennifer Tucker ("Tucker") made about the defendant's drug dealing. On August 22, 2018—the day before the residence warrants were issued—a Metropolitan Nashville Police Department officer stopped Tucker driving a SUV toward Clarksville and found two kilograms of heroin and fentanyl pills in the rear hatch. *Id*. at 3. Tucker waived her Miranda rights and told DEA Agents that she was meeting a "thick black male" in "a large black truck" to deliver the heroin and pills. *Id*. at 3-4. DEA Agents showed Tucker a six-person, photographic line-up, and Tucker identified the defendant as the individual to whom she was delivering the drugs. *Id*. at 4. Tucker stated that she had delivered drugs to the defendant every-other week since January or February 2018. Id. On one occasion, the defendant gave Tucker approximately $40,000 in cash. Id. Tucker said she met the defendant at Bojangles, Wendy's, or the movie theater in Clarksville. *Id*. Tucker also said that the defendant's wife, who always wore a head scarf, drove the defendant to meet with Tucker. *Id*.
>
> The affidavits also described surveillance Agents conducted at the defendant's residences. On May 29, 2018, an Agent observed a black, Dodge Ram pickup truck at 3453 Merganser Drive. *Id*. at 3. The truck was registered to the defendant's wife at the same address. *Id.* During subsequent days of surveillance, Agent Evans saw the defendant and his wife coming and going from 3453 Merganser Drive in the black Dodge Ram. Id. The defendant's wife wore a scarf on her head. *Id*. Then, on August 22, 2018, Agent Evans looked at pole camera footage from August 21,

2018, showing the Dodge Ram loaded with household items, as if the defendant was moving. *Id*. at 4. Agent Evans checked with the Clarksville Department of Electricity ("CDE") and found that the defendant's wife established electric service at 777 Banister Drive on August 20, 2020, and scheduled for electric service to be disconnected at 3453 Merganser Drive as on August 27, 2020. *Id*. On August 22 and August 23, 2018, Agents conducted surveillance at 777 Banister Drive and saw the Dodge Ram registered to the defendant's wife on both occasions. *Id*. On August 23, Agents observed the defendant's wife get out of the Dodge Ram and enter the residence. *Id*.

Finally, Agent Evans included information in the affidavits about the defendant's criminal history. In 1995, the defendant was arrested for aggravated assault, aggravated kidnapping, aggravated robbery, and aggravated burglary. *Id*. In 2003, the defendant was arrested for alteration of identification numbers, tampering with evidence, unlawful possession of a handgun by a convicted felon, possession with intent to distribute more than a half gram of cocaine, gambling, criminal homicide, aggravated robbery, assault, resisting arrest, and evading arrest. *Id*. And, in 2006, the defendant was arrested for possession of a schedule II controlled substance and possession of firearm. *Id*. The defendant was on parole at the time. *Id*. at 2.

(Doc. No. 125 at 7-9).[2]

*Analysis*

*i. Franks Hearing*

"In a *Franks* hearing, a court determines whether to suppress the fruits of an executed search warrant, where the warrant was the result of a false statement." *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019) (citing *Franks*, 438 U.S. at 171). A defendant is entitled to a *Franks* hearing, if he or she "(1) 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,' and (2) 'the allegedly false statement is necessary to the finding of

---

[2] Not included in the Government's description of the information in the affidavits, but pertinent, is the averment that Defendant's parole officer provided information to Agent Evans that indicated Defendant listed his address as 3453 Merganser Drive, Clarksville, Tennessee. (Doc. No. 116-1 at 2). Additionally, Agent Evans averred that the Clarksville Department of Electricity records revealed that electrical services for 3453 Merganser Drive were in the name of Defendant's wife. Thus, the affidavits set forth facts to clearly tie Defendant (though not particular acts of criminality) to this address. Likewise, as suggested by language quoted above and as touched on below, the affidavits set forth facts to clearly tie Defendant's wife (and thus Defendant, although, again, not particular acts of criminality) to 777 Banister Drive.

3

probable cause.'" *United States v. Green*, 572 F. App'x 438, 441 (6th Cir. 2014) (quoting *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001)). But affidavits supporting a search warrant enjoy "a presumption of validity[.]" *Franks*, 438 U.S. at 171. Therefore, a defendant who challenges the veracity of statements made in a sworn affidavit that formed the basis for a warrant bears a "heavy burden." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).

The Sixth Circuit recently instructed that

[a] *Franks* analysis turns on two questions of fact, and one of law. The two questions of fact: One, is there a false statement included in an affidavit? If so, then two, how culpable is the affiant officer in including that statement in the affidavit? Where the affidavit does include a false statement, and where the officer making the statement was culpable in doing so, then the court turns to a question of law: After excising the false statement, is there sufficient information in the affidavit to constitute probable cause to issue a warrant?

*Crawford*, 943 F.3d at 309.

Defendant attacks two of Agent Evans's statements in the affidavit as allegedly false or made in reckless disregard of the truth. He is referring to two alleged facts that Agent Evans specifically identified as being "received . . . from the CS:" (1) "the CS was in prison with [Defendant] for seven years in Hickman County"; and (2) "[Defendant's] telephone number is 615-630-5480." (Doc. No. 116 at 4-5). Defendant does not claim that Agent Evans averred falsely or recklessly in stating that *the CS informed him of the two alleged facts*. Nevertheless, he asserts that Agent Evans inclusion of the two alleged facts was in reckless disregard of their truth because they (i) were actually untrue; and (ii) could easily have been discovered to be untrue by Agent Evans before including them in the affidavit.[3] The Court need not reach the second assertion,

---

[3] Nowhere in the affidavit does Agent Evans actually state that these two alleged facts are true. Rather, he states only that he was informed of these facts (by the CS and, as noted below, also by a probation officer). And in the Court's view, his affidavit cannot reasonably be taken to assert or imply more than that Agent Evans believed them to be true and had no information to suggest that there were not true; this is not the same as affirmatively representing that they are actually true. Nevertheless, the Court will proceed as if Agent Evans, by implication, asserted that these two alleged facts were actually true.

4

because Defendant has not nearly shown the first assertion (upon which the second assertion rests) to be valid. And due the Defendant's inability to establish the untruths he alleges, his bid for a *Franks* hearing fails.

Specifically, Defendant contends that Tennessee Department of Corrections' records demonstrate that Defendant spent less than twelve months in the Turney Center Industrial Complex in Hickman County, "far from the seven years as claimed by the confidential source." (*Id.* at 5 (citing Doc. No. 116-3)). Moreover, Defendant argues that phone subscriber records for Defendant indicate Defendant's phone number was not 615-630-5480. (*Id.* (citing Doc. No. 116-4)). Defendant contends that this information "could have been easily corroborated or debunked by police" and because "Agent Evans did not attempt to corroborate the CS's information and consequently provided the Magistrate with information that is false, Agent Evans' conduct was reckless." (*Id.* at 5-6).

In response, the Government argues primarily that Defendant has not "has not made a substantial preliminary showing that Agent Evans acted with reckless disregard for the truth." [4] The Government points out that the information involving the phone service subscription attached to Defendant's motion shows that the phone number listed in the affidavit is registered to

---

[4] The Government goes on to argue, alternatively, that Defendant cannot establish "that any of the CS's information was deliberately false." (Doc. No. 125 at 19). The Government fails to explain the relevance here, as the issue is not whether the *CS provided Agent Evans* with the two alleged facts to knowing them to be false. Rather, it is whether *Agent Evans included them in the affidavit* either knowing them to be false or with reckless disregard to their falsity. Indeed, the Government slightly earlier in its brief had made this precise distinction:

> The deliberate falsity or reckless disregard for the truth "is only that of the affiant, not of any nongovernmental informant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). "[I]f the warrant affiant had no reason to believe the information was false, there was no violation of the Fourth Amendment." *Id.* at 172 n.8; *see also* [*United States v. Brown*, 732 F.3d 569, 575 (6th Cir. 2013)]; *United States v. Neal*, 577 F. App'x 434, 451 (6th Cir. 2014) (holding that inconsistencies in informant's information revealed after submission of affidavit did not show that affiant acted with reckless disregard of truth).

*Id.* at 18.

5

Defendant's wife. (Doc. No. 125 at 18). Further, the Government asserts that it was possible that the CS was merely mistaken about the amount of time he spent in prison with Defendant, as the records do indicate that Defendant did spend time incarcerated in Hickman County. (*Id*.). Further, the Government argues that even if these statements are considered false, Defendant fails to establish that Agent Evans had any reason to believe that the CS's information was untrue and "[w]ithout knowing any purported falsities or any credibility issues related to the CS, Agent Evans could not have acted recklessly." (*Id*.)

In regard to the phone number, Defendant's evidence does not show that Agent Evans' representative was false, let alone knowingly or recklessly false. Defendant proffered cell phone records that reveal the phone number listed as Defendant's in the warrant affidavit was registered to Defendant's wife. This fact makes it far from clear that Agent Evans was incorrect in making the specific representation he made in the affidavit, *i.e.,* that '[Defendant's] telephone number is 615-630-5480." Of course, a person's cellphone (with a particular cellphone number, say, 123-456-7890) can be registered under the name of a spouse; and even if the cellphone registered to the spouse is in fact used regularly by the spouse, it well might also be used regularly by the person—in which case it would not be inaccurate to say that "[the person's] telephone number is "123-456-7890." If anything, evidence tying 615-630-5480 to Defendant's spouse tends to suggest that Agent Evans was correct in identifying that number as "[Defendant's] telephone number." There is no basis to say that Agent Evans made a false representation here. Still less is there a basis to say that it was *knowingly or recklessly false*. Although the Government for some reason does not rely on this fact in making its specific argument here, *Agent Evans had (and explained in the affidavit) corroboration for this claim*. The affidavit stated:

Agent Nolder received information from Officer Amy Carroll of Probation and Parole. Within the information was a personal data sheet for Donnell BOOKER, who is on Parole until November 5, 2024 for Schedule II Drugs; Cocaine, Aggravated Robbery and Attempted Second Degree Murder.

Within the personal information for D. BOOKER was the following:
- His address is 3453 Merganser Drive, Clarksville, TN 37042.
- His telephone number is 615-630-5480.

(Doc. No. 116-1 at 2). In short, Agent Evans had (and disclosed in the affidavit) corroboration for the CS's assertion that Defendant's telephone number was 615-630-5480.

In his reply, Defendant transitions from arguing that the statement was incorrect because the cellphone number was not his to arguing that the statement was incorrect because he changed his cellphone number on June 3, 2018,[5] and the warrant affidavit Agent Evans provided on August 23, 2018 stated that "[Defendant's] telephone number *is* 615-630-5480." (Doc. No. 134 at 3 (emphasis added)). But the Court, despite its above-indicated inclination to assume *arguendo* the correctness of Defendant's construction of Agent Evans' affidavit, is unwilling to go so far as to say even *arguendo* that Agent Evans represented that Defendant's number was 615-630-5480 as of the date the affidavit was sworn out. He was quite clear that he was merely reporting information he had received from others about Defendant's phone number *as of a particular date*. He does not say, or even arguably imply, that the number had not changed in the meantime. It is no secret— and surely not a secret to judicial officers who entertain search warrant applications—that drug dealers (which of course is what the affidavit alleged Defendant to be) sometimes change their cell phone numbers. The affidavit unambiguously left open the possibility that this had occurred in Defendant's case prior to Agent Evans swearing to the affidavit, and the issuing magistrate could have inquired further about, or taken into account, this possibility as the issuing magistrate saw fit.

---

[5] Defendant's evidence to substantiate the fact of this change is hardly crystal clear. But drawing inferences from the evidence (a cell phone bill in his wife's name filed as Doc. No. 116-4), it appears that use of a new number began as of June 3, 2018 and that calls on 615-630-5480 (and one other number) ceased as of that date and that "the line access fee" for those two numbers ended by the close of the billing cycle (June 4, 2018). Accordingly, the Court will accept this fact as true for present purposes.

7

Even if the Court were to consider Agent Evans to have falsely represented that Defendant's phone number was 615-630-5480 specifically at the time Agent Evans submitted the affidavit when in fact it was a number Defendant had used in the past, Defendant has not shown as required that Agent Evans included this representation in the affidavit "knowing[ or] inten[ding it to be false] or with reckless disregard for [its] truth." *Green*, 572 F. App'x at 441. There is no evidence to suggest that Agent Evans knew of a change in the number. There likewise is no basis for a finding of reckless disregard of the fact of the change beyond the fact that Agent Evans did not check to see whether Defendant's number had changed. But this assertion, even if true, fails to establish reckless disregard. As discussed below, failure to corroborate information—here, the identity of Defendant's current phone number—does not constitute reckless disregard for the truth of the information where the affiant has no reason to believe that the information was false. Here, as indicated above, it was certainly *possible* that Defendant's cell number had changed, but as far as the record shows, Agent Evans had no particular reason to believe that in fact it had changed.

Likewise, although Defendant did proffer evidence that, contrary to the claim contained in the affidavit, to the effect that he was not housed in the Turney Center Industrial Complex for seven years, Defendant has not adduced evidence to demonstrate that Agent Evans "knowingly and intentionally or with reckless disregard for the truth" included the statement that Defendant and the CS were incarcerated together for seven years. *Id.*

In *Franks*, the Supreme Court explicitly recognized that there may be facts in a search warrant affidavit that are not "necessarily correct," yet, still pass muster under the Fourth Amendment if those facts are "believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165 (emphasis added) "[I]f the warrant affiant had no reason to believe the information was false, there was no violation of the Fourth Amendment." *Id.* at 172 n.8. Accordingly, the

8

question is whether Agent Evans knew, or had reason to believe, that that the information provided by the CS was false. *United States v. Williams*, 576 F.3d 1149, 1162 (10th Cir. 2009); *see also United States v. Hudson*, 325 F. App'x 423, 426 (6th Cir. 2009) (affirming the district court's denial of a *Franks* hearing because the defendant's evidence of inaccuracies in the affidavit "attack only the informant's credibility, . . . not that of [the affiants]").

Defendant argues that Agent Evans failure to corroborate these facts was reckless because "these facts could have been easily corroborated or debunked by the police." (Doc. No. 116 at 6). Defendant provides no authority to support his position that an officer's failure to corroborate a fact that "could have been easily corroborated" amounts to reckless conduct, especially where an officer was relying on information from another law enforcement officer that a confidential source had been reliable in the past. *See Crawford*, 943 F.3d at 306 ("If the affiant officer avers that another officer has vouched for the informant's reliability, that [] will typically satisfy our reliability inquiry."). And plenty of authority stands for the opposite conclusion, *i.e.*, that an affiant officer is not reckless in failing to corroborate a fact that he or she had no reason to believe was false. *See United States v. Neal*, No. 3:11-CR-69, 2012 WL 2154271, at *7 (E.D. Tenn. June 12, 2012), *aff'd*, 577 F. App'x 434 (6th Cir. 2014) (failure to corroborate informant's statements used in affidavit was not a "reckless disregard for the truth"); *United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009) (explaining that the affiant's "failure to corroborate the informant's story did not constitute reckless disregard for the truth"); *see also Brown*, 732 F.3d at 575 (affirming denial of a *Franks* hearing and explaining that presence of false statement in an affidavit where the affiant "must have typed it up wrong" merely showed the affiant was negligent).

Agent Evans averred in the affidavit that he had been informed by another law enforcement officer, Officer Rodney Anderson of the Jackson Police Department, that the CS had been a

reliable informant for years over the course of numerous investigations. (Doc. No. 116-1 at 2). Thus, Agent Evan's failure to independently corroborate these two more or less background facts that he had no reason to doubt the veracity of amounts, to at most, mere negligence. And "a little negligence—actually even a lot of negligence—does not the need for a *Franks* hearing make." *United States v. Swanson*, 210 F.3d 788, 791 (7th Cir. 2000). Accordingly, Defendant has not met his heavy burden to show that the affiant, Agent Evans, either knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit.

Furthermore, even assuming Agent Evans was reckless in including these two facts in the affidavit, these facts are rather insubstantial when considering the allegations in the affidavit in their totality, and thus, if excised from the warrant affidavit would not be necessary to the finding of probable cause. *Green*, 572 F. App'x at 441 (explaining that the defendant has the heavy burden of demonstrating that "the allegedly false statement[s] [were] necessary to the finding of probable cause.'"); *see also Crawford*, 943 F.3d at 309-310. The contribution of these two facts to the showing of probable cause is minimal; they do not relate to the particular circumstances involving the alleged crimes or the premises to be search, in the affidavit. It seems they were included to help substantiate that CS actually knew Defendant and had dealt with him recently prior to the discussion with Agent Evans—facts that are supported by other averments in the affidavit anyway. Excising these two less than crucial facts from an affidavit that includes numerous factual allegations, including information from another source, would do little to destroy a finding of probable cause. (Doc. No. 116-1). Thus, similar to *Crawford*, "the truthful evidence in the affidavit [] outweighs any concern over the inclusion of arguably false content." *Crawford*, 943 F.3d at 309. Accordingly, Defendant's Motion for a *Franks* hearing will be denied.

ii. *Suppression of Evidence from 777 Banister Drive and 3453 Merganser Drive*

Defendant asserts in his motion to suppress that the affidavits for both residences, which have identical language, fail to establish a nexus to 777 Banister Drive, because the affidavits include only two sentences that refer to 777 Banister Drive. In his reply, he expands his argument and contends that the affidavits do not establish a sufficient nexus to either 3453 Merganser Drive or 777 Banister Drive. He argues that only a single sentence in the affidavit potentially connects criminal activity to 3453 Merganser Drive: "The last time that the CS was at [Defendant's] house, the CS saw $52,000 on the bed." (Doc. No. 134 at 3-4).[6]

Assuming *arguendo* that the allegations in the affidavits do not give rise to probable cause, the good-faith exception to the exclusionary rule easily dispels of Defendant's argument. Even if a search warrant is determined not to have been supported by probable cause, such that the search was in violation of the Fourth Amendment, the fruits of the search are not necessarily suppressible. Pursuant to *United States v. Leon*, 468 U.S. 897 (1984), "the introduction of evidence obtained in violation of the Fourth Amendment is permitted in criminal trials when the evidence is 'obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth

[6] Defendant asks the Court not to consider any of the information provided by the CS in the warrant affidavit "because of the false information provided by the CS, regarding his contact with [Defendant] in prison, and [Defendant's] phone number." (Doc. No. 116 at 6). Then, Defendant argues that "[w]ithout the information provided by the CS, the search warrant fails to establish probable cause as neither warrant provides a nexus to either location." (*Id*.). As discussed above, the Court will deny Defendant's request for a *Franks* hearing. Thus, if the Court were to conduct a probable cause determination, the Court would consider the CS's statements in the warrant affidavit, because when determining whether probable cause existed to issue the warrant, it is the Court's job to review the affidavit as the issuing magistrate received it. *See Crawford*, 943 F.3d at 306 ("the reviewing court, in assessing whether there was probable cause for the warrant to issue, is limited to examining only 'the information presented in the four-corners of the affidavit.'" (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005))); *United States v. Jennings*, 396 F.3d 751, 760 (6th Cir. 2005) (explaining that a court determining the sufficiency of an affidavit in support of a search warrant is concerned only with the statements contained within the affidavit itself). And to the extent Defendant invokes these false statements to attack the CS's reliability for purposes of attacking probable cause in the affidavit, the Sixth Circuit has instructed that "[i]f the affiant officer avers that another officer has vouched for the informant's reliability, that [] will typically satisfy our reliability inquiry." *See Crawford*, 943 F.3d at 306. Nevertheless, as discussed below, a probable cause analysis is not needed here, because the Court finds that the good-faith exception to the exclusionary rule applies.

11

Amendment.'" *United States v. Moorehead*, 912 F.3d 963, 968 (6th Cir. 2019) (quoting *Leon*, 468 U.S. at 909). A search warrant affidavit is insufficient for police to rely upon in good-faith if it is "bare bones." But if an affidavit is not bare-bones, it is one upon which an officer can rely in good-faith. *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (en banc).

"[T]o be considered bare bones, an affidavit must be 'so lacking in indicia of probable cause' as to make an officer's 'belief in its existence [] objectively unreasonable.'" *Id.* (quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005)). An affidavit is bare bones only if it "merely 'states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" *Id.* (quoting *United States v. Washington*, 380 F.3d 236, 241 n.4 (6th Cir. 2004)). "An affidavit need only present 'some connection, regardless of how remote it may have been,' *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017) (quoting *Laughton*, 409 F.3d at 749–50), or, in other words, establish a 'minimally sufficient nexus between the illegal activity and the place to be searched,' *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016) (quoting *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc)), to avoid the bare-bones designation and thus be one upon which an officer can rely in good faith." *Id.* at 313. Further, "[t]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* (citation and internal quotation marks omitted).

In this case, like in *Christian*, "it is impossible to deny that [the warrant affidavit] contains factual allegations, not just suspicions or conclusions." *Id.* Here, the affidavits include numerous factual allegations that link Defendant to dealing narcotics, including statements by two informants. (Doc. No. 116-1). And the affidavits include specific facts demonstrating that, and how, the police confirmed that Defendant lived at Merganser Drive: by collecting information

12

from Defendant's parole officer that indicated Defendant listed his address as 3453 Merganser Drive; by conducting surveillance and observing vehicles registered to Defendant and his wife in the driveway; and by checking Clarksville Department of Electricity ("CDE") records to discover that the account electrical services at the property was in Defendant's wife's name. (*Id*. at 2-3). Further, law enforcement conducted surveillance and observed Defendant and his wife load their cars at Merganser Drive with household items. (*Id*. at 4). Law enforcement checked CDE records to find Defendant's wife had initiated electricity service at 777 Banister Drive and, thereafter, observed Defendant's wife arrive at 777 Banister Drive (with the garage door open). (*Id*.). Although the facts linking Defendant to his home are not specifically crime-related, "in the case of drug dealers," the Sixth Circuit has observed that "evidence is likely to be found where the dealer lives." *Crawford*, 943 F.3d at 309 (quoting *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998)) (internal quotation marks omitted). Therefore, "a court issuing a warrant 'may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking.'" *Id*. (quoting *Untied States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008)). Accordingly, the affidavits are not the type of "bare bones" affidavits upon which it would be objectively unreasonable for an officer to rely. *See Christian*, 925 F.3d at 313.[7]

Further, the "exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates" *Christian*, 925 F.3d at 313 (citing *Leon*, 468 U.S. at 916). As determined above, as far as the record shows, Agent Evans did not intentionally or recklessly provide false information to the issuing magistrate, and "[i]solated negligence does not justify

---

[7] Although prevalent, the term "good-faith" as used in this context appears actually to be a misnomer. The "good faith" exception does not turn on the officers' "good-faith"—a subjective concept—but on whether their actions were objectively reasonable. *See United States v. Savoca*, 761 F.2d 292, 294 n.1, 295 (6th Cir. 1985). The Court does wonder, however, whether this principle has been qualified somewhat by *Christian*, which relied in part on the "utter lack of police wrongdoing," 925 F.3d at 313, a term which arguably could understood to include a lack of subjective bad faith on the part of the police.

13

suppression." *United States v. Helton*, No. 6:19-CR-41-CHB-HAI-1, 2019 WL 8406952, at *9 (E.D. Ky. Dec. 26, 2019) (citing *Davis*, 564 U.S. at 239). Therefore, like in *Christian*, "[t]his is a particularly egregious case to misapply the good-faith exception given the utter lack of police wrongdoing." *Id.*

Therefore, the Court finds that even if the allegations in the affidavits did not show what amounted to probable cause (which the Court does not hold), the good-faith exception to the exclusionary rule applies. Accordingly, the fruits of the search of the warrant based on that affidavit will not be suppressed. Defendant's Motion to Suppress Evidence Seized from the Search of 777 Banister Drive and 3453 Merganser Drive (Doc. No. 116) will be denied.

**II. Motion to Disclose Confidential Source (Doc. No. 114)**

Relatedly, Defendant asks the Court to order the Government to disclose the name and address of the confidential source utilized by the Government in this case. (Doc. No. 114 at 1). Defendant contends that disclosure of the confidential source is "imperative" to test his reliability, because counsel for Defendant has already determined he "lied" twice to Agent Evans without knowing his identity. In his reply, Defendant surmises who the confidential source may be, and suggests that that person has outstanding warrants. (Doc. No. 138). Defendant notes that it is unclear whether Agent Evans was aware of these outstanding warrants. But if the issuing magistrate had been aware, Defendant claims, the issuing magistrate may have questioned the confidential source's reliability when determining whether to issue the warrant. (*Id.*).

The Court finds that based on its above finding that the good-faith exception to the exclusionary rule applies, the request for disclosure of the confidential source to test his reliability for purposes of determining if probable cause was present to issue the warrant is effectively moot. Furthermore, even if the Court did conduct a probable cause analysis that included an examination

14

of the CS's reliability, the weight to give to a confidential source's information as part of the probable cause analysis is based on the information present in the affidavit. *See United States v. Sales*, 247 F. App'x 730, 733 (6th Cir. 2007) ("A review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit."). Moreover, as the Government aptly points out in its response,

> [w]hile fundamental fairness requires disclosure of an informant's identity when it is 'relevant and helpful to the defense of an accused,' *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957), "[d]ue process does not require the disclosure of an informant's identity at a suppression hearing.' *United States v. Cummins*, 912 F.2d 98, 103 (6th Cir. 1990) (citing *United States v. Raddatz*, 447 U.S. 667, 679 (1980)).

(Doc. No. 124 at 1-2). Accordingly, Defendant's Motion to Disclose Confidential Source (Doc. No. 114) will be denied.

### III. Motion to Suppress Evidence Seized at 777 Banister Drive (Doc. No. 118)

Defendant argues that law enforcement exceeded the scope of the warrant to search 777 Banister Drive, which authorized a search for particular kinds of items, when law enforcement cut off the water to 777 Banister Drive prior to the execution of the warrant, and thereafter pulled a toilet from the floor during the search. Defendant argues that by searching the toilet, the officers engaged in an unlawful "general search" of his residence in violation of the Fourth Amendment.

*Background*

As discussed above, on August 23, 2018, Agent Evans obtained a search warrant to search 777 Banister Drive. The search warrant authorized law enforcement to search for:

> Any books or documents adapted and used for the purpose of producing, packaging, dispensing, delivering or obtaining controlled substances and any equipment, records, computers, and storage discs to include the seizure of computers to retrieve such records, or recoding transactions involving controlled substances.

> All cellular phones and portable electronic devices used for the purpose of communicating drug co-conspirators.

15

All cellular phone data, records of any/all drug proceeds, records of other drug co-conspirators, names associated with drug business, telephone numbers associated with drug business, records of any drug transaction text messages, phone records and pictures.

Any indicia of ownership, dominion, or control over the premises to be searched including all financial records pertaining to the disposition of the proceed of the violation of the criminal laws specified above, whether stored on paper, magnetic media, programable instruments, to include but not limited to telephones, answering machines, electronic address books.

Any photographs of any persons involved in the criminal conduct whether stored on paper or memory device.

Any goods, personal property, or item of value, including U.S. currency constituting proceeds of a violation of the aforesaid laws and any evidence or items which would be used to conceal the foregoing or prevent its discovery.

(Doc. No. 118-1 at 1). A search pursuant to the warrant was executed on August 24, 2018. (*Id*. at 7). According to a report written by Officer Lon Chaney,[8] a member of the Tactical Unit used a tool to cut the water off to 777 Banister Drive from the meter immediately prior to execution of the search warrant. (Doc. No. 118-2). Thereafter, during execution of the warrant Officer Chaney observed a drop of water on the floor beside a toilet. There were also two zip lock bags, a torn pouch, and a black garbage bag on the sink next to the toilet that appeared to contain a white powder residue. (*Id*.). Officer Chaney investigated the toilet tank and noticed that the tank was empty, and therefore to him "it was evident the toilet was flushed"; from this part of his written report the Court infers without difficulty that what Officer Chaney concluded, reasonably, was that the toilet had been flushed recently, *i.e.*, sometime after the water had been shut off. (*Id*.). The

---

[8] Defendant filed this written report and relied on its contents as truthful, and so the Court will rely on those contents as well. The Court notes that such contents are consistent with, though slightly more detailed in relevant part, than the affidavit of Officer Chaney filed by the Government (Doc No. 125-4).

officers then "removed the toilet,"[9] whereupon a baggie, filled with numerous blue pills, fell from inside the toilet to the ground. (*Id*.).[10] As the report next disclosed:

> The baggie was filled with a number of blue pills. The neck of the toilet was broken open and two more bags were located. These bags too were filled with blue pills. Examining the bags, I could see the pills were scored M 30. Using an online database, they were identified as 30mg Oxycodone. I was notified the pills might contain Fentanyl and so the decision was made to not open the bags to conduct a count or field test.

*Id.*

*Analysis*

Defendant argues that in searching the toilet, the officers disregarded the limitations of the search warrant and that "a flagrant disregard of the limitations of a search warrant might make an otherwise valid search an impermissible search requiring the suppression of all evidence seized during the search." (Doc. No. 118 at 6). The Government asserts that the officers did not disregard the limitations of the search warrant, because a toilet is a place where documents or small electronics can be found. (Doc. No. 125 at 18-19). Further, the Government contends that even if the officers went beyond the scope of the warrant in opening Defendant's toilet, they did not flagrantly disregard the limitations of the warrant. (*Id*.).

The Sixth Circuit has explained that

> The phrase "general search" embodies a specific Fourth Amendment term of art, accompanied by particular rules, policies, and remedies. A search pursuant to a valid warrant may devolve into an invalid general search if the officers "flagrant[ly] disregard ... the limitations of [the] search warrant." *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir.1985). For purposes of general search analysis, we will find that an officer flagrantly disregards the limitations of a warrant only where he "exceed[s] the scope of the warrant in the places searched" (rather than the items seized). *See Waller v. Georgia*, 467 U.S. 39, 43 n. 3, 104 S. Ct. 2210, 81 L.Ed.2d 31 (1984) (emphasis added).

---

[9] By this phrase, Officer Chaney apparently meant "disconnected from the floor," as reflected in the photographs filed by defendant at Doc. No. 118-3.

[10] As indicated above, Defendant does not appear to dispute these factual allegations, and in fact relies on them for purposes of this motion.

*United States v. Garcia*, 496 F.3d 495, 507 (6th Cir. 2007). "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820-21 (1982). "When the 'objects to be found' are small, the legitimate scope of the search is broad." *United States v. Hodge*, 714 F.3d 380, 388 (6th Cir. 2013); *see also United States v. Herrera*, 636 F. App'x 250, 253 (6th Cir. 2016) ("[W]hen a warrant has authorized officers to look anywhere on a particular property for a small, easy-to-conceal item, it would be extremely difficult to establish that the officers search in places not authorized." (internal quotations omitted)).

Here, the warrant permitted the seizure of all types of documents, as well as electronic devices such as cell phones and storage devices. (Doc. No. 118-1). These types of things could possibly be flushed down a toilet, and case law indicates these types of items in fact have been flushed down toilets or hidden in toilets. *See United States v. Rivera-Hidalgo*, 458 F. App'x 449, 451 (6th Cir. 2012) (finding cash in toilet tank); *United States v. Newbern*, 731 F.2d 744, 747 (11th Cir. 1984) (documents pertaining to the DC–4 airplane which had earlier landed loaded with marijuana were flushed down a toilet). Because the items listed in the warrant *could* have been flushed down a toilet, the officers did not exceed the scope of the warrant by looking in the toilet bowl and tank to see that the toilet had been flushed.

That leads to the question of whether the officers' act of pulling the toilet out of the floor to discover what exactly had been flushed exceeded the scope of the warrant that authorized officers to search the premises of 777 Banister Drive. In *United States v. Whisnant*, 545 F. Supp. 2d 713 (E.D. Tenn. 2008), *aff'd*, 391 F. App'x 426 (6th Cir. 2010), during the execution of a search warrant, the officers cut into an interior wall of the defendant's home and discovered rolls of cloth.

18

The defendant argued that the officers exceeded the scope of the warrant to search "the premises" by cutting into the interior wall. The court rejected the defendant's argument, holding that the officer did not exceed the scope of the warrant. The court stated that the search warrant particularly described the items that were to be sought:

> the body of Jean Johnson ... or portions thereof; human blood; the purse and personal affects [sic] of Jean Johnson; Ford van keys; a pink suitcase; a small security camera and video cassette tape; a .38 caliber Smith and Wesson pistol, Model 36 . . . ; bombs; gun powder, explosives and bomb components.

*Id.* at 717. And these items could reasonably be expected to be secreted inside of a wall. Therefore, the officers acted reasonably in knocking down the interior wall. *Id.*

The court in *Whisnant* relied on *United States v. Becker*, 929 F.2d 442 (9th Cir. 1991). In *Becker*, officers executing a search warrant on a residence and adjacent shop noticed what appeared to be a newly-poured concrete pad near the shop. The officers used a jackhammer to remove portions of the concrete slab. Underneath the concrete, officers found and seized evidence of methamphetamine. The court found no constitutional violation, saying that the concrete slab was located within the area of the search warrant and, thus, "searching beneath it was clearly within the scope of the warrant." *Id.* at 446. Moreover, although the officers had time to obtain an additional warrant for the area under the slab, the court held that it was "unnecessary for them to do so as they already had a warrant to search the premises for precisely the type of evidence found under the slab." *Id.*

The Court finds the above authorities persuasive and concludes that removing the toilet was within the scope of the warrant that authorized a search of "the premises" of 777 Banister Drive, because the items to be seized listed in the search warrant could be found within the toilet. It is true that they could not be sought without damaging the toilet by pulling it out of the floor and breaking it, but that does not change the result, because "officers executing search warrants on

19

occasion must damage property in order to perform their duty[.]" *See Dalia v. United States*, 441 U.S. 238, 258 (1979). Because the officers did not exceed the scope of the warrant, and certainly did not flagrantly exceed the scope of the warrant, Defendant's Motion to Suppress Evidence Seized at 777 Banister Drive (Doc. No. 118) will be denied.

**IV. Motion to Suppress Search of Dodge Ram Driven By Vanessa Booker on August 24, 2018 (Doc. No. 115).**

Defendant seeks to suppress all evidence seized from the unlawful search of a Dodge Ram driven by Vanessa Booker (Defendant's wife) on August 24, 2018. (Doc. No. 115). Defendant contends that Ms. Booker was stopped as she was driving away from 3453 Merganser Drive, and prior to execution of the warrant; thus, the search of the Dodge Ram did not fall within the scope of the warrant to search 3453 Merganser Drive. In response, the Government invokes the automobile exception to the warrant requirement and argues that the search of the Dodge Ram was legal because the officers had probable cause to believe that the Dodge Ram contained the same type of evidence the officers expected to find at 3453 Merganser Drive, for which they had a search warrant. (Doc. No. 125).

The Government has attached affidavits of Sergeant Beebe (Doc. No. 125-5) and Agent Evans (Doc. No. 125-3), which offer details of the circumstances of the traffic stop and facts they believe gave rise to probable cause to search the vehicle. Therefore, the Government has supported its argument with evidence on the record; nevertheless, the Court strongly believes that Defendant should have an opportunity to cross-examine law enforcement about these alleged facts and circumstances and offer countervailing evidence. Therefore, the Court will hold an evidentiary hearing to resolve this matter.

**V. Motion to Suppress Search of U-Haul Moving and Storage Room 093 (Doc. No. 117)**

Defendant asks the Court to suppress all evidence recovered from the search of the U-Haul

Moving & Storage Room 093 located at 2830 Wilma Rudolph Boulevard, Clarksville, Tennessee

("Storage Room 093").

*Background*

On August 24, 2018, Agent Evans obtained a search warrant signed by a General Sessions

Court Judge of Montgomery County, Tennessee, authorizing a search of Storage Room 093. (Doc.

No. 117-1). In the affidavit attached to the search warrant, Agent Evans averred:

> At 3453 Merganser Drive, Agents located a baggie of unknown powder, used baggies and assorted paperwork within the residence. Included with the assorted paperwork was a suspected drug ledger and a piece of cardboard with writing. The suspected drug ledger was handwritten and had twelve different names on it with individual dollar amounts. The total dollar amount was $69,763.00. The piece of cardboard had miscellaneous notes written on it to include the name Armando LOPEX with a telephone number of 615-606-6776 and another number of 369298. During an inventory of the Dodge Ram, Agents located a key card for U-Haul Self-Storage Security Access.

> During the search of 777 Banister Drive, Agents located two pouches containing approximately $50,000.00 that [Defendant] had thrown into the air return, three baggies containing approximately 100 suspected Fentanyl pulls that [Defendant] had attempted to flush down the toilet, two digital scales, a box of baggies, a hydraulic press, a money counter and assorted paperwork. Included with the assorted paperwork was an invoice from U-Haul Moving & Storage (2830 Wilma Rudolph Boulevard) for Room 093. The invoice is in the name of [Defendant's wife] and dated June 2, 2018. Also included with the paperwork were suspected drug ledgers. The suspected drug ledgers were handwritten and nineteen different names on it with individual dollar amounts. The total dollar amount was $20,218.00.

> Your Affiant spoke with staff at U-Haul Moving & Storage (2830 Wilma Rudolph Boulevard), who advised that Room 093 is an account in good standing in the name of [Defendant's wife] through September 2, 2018.

(Doc. No. 117-1). The search warrant authorized law enforcement to search for the following

evidence:

> Any books or documents adapted and used for the purpose of producing, packaging, dispensing, delivering or obtaining controlled substances and any equipment, records, computers, and storage discs to include the seizure of computers to retrieve such records, or recoding transactions involving controlled

substances.

All cellular phones and portable electronic devices used for the purpose of communicating drug co-conspirators.

All cellular phone data, records of any/all drug proceeds, records of other drug co-conspirators, names associated with drug business, telephone numbers associated with drug business, records of any drug transaction text messages, phone records and pictures.

Any indicia of ownership, dominion, or control over the premises to be searched including all financial records pertaining to the disposition of the proceed of the violation of the criminal laws specified above, whether stored on paper, magnetic media, programable instruments, to include but not limited to telephones, answering machines, electronic address books.

Any photographs of any persons involved in the criminal conduct whether stored on paper or memory device.

Any goods, personal property, or item of value, including U.S. currency constituting proceeds of a violation of the aforesaid laws and any evidence or items which would be used to conceal the foregoing or prevent its discovery.

(*Id*.). The evidence property sheet indicates that ammunition, a Rossi 38 caliber revolver, and "saran-wrapped packages (all in yellow envelopes)," among other things, were seized from Storage Room 093. (*Id*. at 6).

*Analysis*

Defendant argues that "the illegal search of 777 Banister Drive and the Dodge Ram consequently make the search of the U-Haul storage facility unconstitutional" because law enforcement learned of the U-Haul storage room when a storage unit key was discovered during a search of the Dodge Ram, and a receipt from U-Haul was discovered in 777 Banister Drive. (Doc. No. 117 at 3). Thus, Defendant argues that anything discovered in the U-Haul storage room is fruit of the poisonous tree and should be excluded.

As explained above, the Court finds that the search of 777 Banister Drive, wherein the officers seized the U-Haul receipt, was constitutional; however, the Court cannot resolve the

constitutionality of the stop and search of the Dodge Ram at this juncture due to factual issues that require an evidentiary hearing. Nevertheless, the Government asserts that "if the seizure of *either* the U-Haul invoice or the key card was lawful, the storage warrant was still supported by probable cause." (Doc. No. 125 at 27 (emphasis added)). The Government relies on the independent source doctrine for this proposition. (*Id*. at 26-27).

The independent source doctrine "holds that evidence will be admitted if the government shows that it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Chapman-Sexton*, 758 F. App'x 437, 440 (6th Cir. 2018) (quoting *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005)) (internal quotation marks omitted). "So evidence obtained pursuant to a search warrant that relied, in part, on unlawfully obtained information may nevertheless be admissible under the independent-source doctrine." *Id*. at 440-41. In order to establish that the doctrine applies to a warrant based on both legally and illegally obtained information, the Government must show, by a preponderance of the evidence, that: (1) that a neutral magistrate would have issued the search warrant even if not presented with the information obtained from the illegal search; and (2) the initial search did not prompt officers to seek a warrant for the second search. *United States v. Williams*, 656 F. App'x 751, 754 (6th Cir. 2016) (citing *Jenkins*, 396 F.3d at 758, 761)). The second prong is a fact-based inquiry that requires the Court to assess the record. *Id*. (citing *Murray v. United States*, 487 U.S. 533, 540 n.2 (1988)). An officer's testimony as to whether the illegal search led police to seek a warrant can be probative as to this issue. *Id*. However, "[w]here the facts render [officer] assurances implausible, the independent source doctrine will not apply." *Id*. (quoting *Murray*, 487 U.S. at 540 n. 2)).

The Court cannot determine the constitutionality of the search of Storage Room 093 on the current record. It needs to determine first whether the search of the Dodge Ram was illegal and, if

so, determine whether the search of the Dodge Ram prompted the search of Storage Room 093. As noted, an evidentiary hearing is required as to the first issue. And an evidentiary hearing also would be required for the second issue if it is reached; the Court presently has no way of knowing what it needs to know to decide the second issue. There is no evidence in the record indicating the extent to which the officers sought the warrant to search Storage Room 093 based on the U-Haul receipt found as fruits of the search at 3453 Merganser Drive (which the Court has declined to find unconstitutional, as discussed above) and/or based on the key card found as a result of the search of the Dodge Ram (the constitutionality of which the Court has not yet determined).[11] An evidentiary hearing is necessary to receive evidence on these points.

Moreover, even if the Court were to determine that the *search* of Storage Room 093 was constitutionally valid, an evidentiary hearing would still be needed to determine whether the plain-view exception applies to justify the *seizure* of the ammunition, firearm, and yellow envelopes containing saran-wrapped packages. If the analysis reaches this stage, the Court will receive evidence on this issue at the evidentiary hearing. Accordingly, the Court's decision on this Motion is deferred until the evidentiary hearing.

## CONCLUSION

For the above-stated reasons, Defendant's Motion for Disclosure of Confidential Source (Doc. No. 114), Motion to Suppress Evidence Seized from the Search of 777 Banister Drive and 3453 Merganser Drive (Doc. No. 116), and Motion to Suppress Evidence Seized at 777 Banister Drive (Doc. No. 118) will be denied. Defendant's Motion to Suppress Evidence Seized from the Dodge Ram (Doc. No. 115), and Motion to Suppress Evidence Seized from the U-Haul Moving

---

[11] And even if the Government had submitted evidence on these points, an evidentiary hearing still would have been required in all likelihood. Such evidence presumably would have been in the form of an affidavit from one or more officers, and the Court believes that the testimony of such officer(s) would need to be subject to cross-examination and to challenge by any countervailing evidence Defendant may wish to offer.

& Storage Room 093 (Doc. No. 117) will be decided after the evidentiary hearing set for July 9, 2020 at 9:00 a.m.

An appropriate Order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE